**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| STEPHANIE LENZ,<br>　　　　　*Plaintiff-Appellee/*<br>　　　　　*Cross-Appellant*,<br><br>　　　　　v.<br><br>UNIVERSAL MUSIC CORP.;<br>UNIVERSAL MUSIC PUBLISHING INC.;<br>UNIVERSAL MUSIC PUBLISHING<br>GROUP INC.,<br>　　　　　*Defendants-Appellants/*<br>　　　　　*Cross-Appellees*. | Nos. 13-16106<br>　　　　13-16107<br><br>D.C. No.<br>5:07-cv-03783-<br>JF<br><br>ORDER AND<br>AMENDED<br>OPINION |

Appeal from the United States District Court
for the Northern District of California
Jeremy D. Fogel, District Judge, Presiding

Argued and Submitted
July 7, 2015—San Francisco, California

Filed September 14, 2015
Amended March 17, 2016

Before: Richard C. Tallman, Milan D. Smith, Jr.,
and Mary H. Murguia, Circuit Judges.

Order;
Opinion by Judge Tallman;
Partial Concurrence and Partial Dissent by Judge Milan D.
Smith, Jr.

## SUMMARY[*]

### Digital Millennium Copyright Act

The panel filed (1) an order amending its prior opinion and dissent and denying appellants' petition for panel rehearing and cross-appellant's petitions for panel rehearing and rehearing en banc; and (2) an amended opinion and dissent in an action under the Digital Millennium Copyright Act.

The panel affirmed the district court's denial of the parties' cross-motions for summary judgment on a claim that the defendants violated 17 U.S.C. § 512(f) by misrepresenting in a takedown notification that the plaintiff's home video constituted an infringing use of a portion of a Prince composition.

The panel held that the DCMA requires copyright holders to consider fair use before sending a takedown notification, and that there was a triable issue as to whether the defendant copyright holders formed a subjective good faith belief that plaintiff's use was not authorized by law. Regarding good faith belief, the panel held that the plaintiff could proceed under an actual knowledge theory. The panel held that the willful blindness doctrine may be used to determine whether a copyright holder knowingly materially misrepresented that it held a good faith belief that the offending activity was not a fair use. The plaintiff here, however, could not proceed to trial under a willful blindness theory because she did not

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

show that the defendants subjectively believed there was a high probability that the video constituted fair use. The panel also held that a plaintiff may seek recovery of nominal damages for an injury incurred as a result of a § 512(f) misrepresentation.

Judge M. Smith concurred in part and dissented in part. Dissenting from Part IV.C of the majority opinion, addressing good faith belief, he wrote that there was not a triable issue and that the plaintiff was entitled to summary judgment. He wrote that he agreed with the majority's conclusion that the DCMA requires copyright holders to consider whether potentially infringing material is a fair use before issuing a takedown notice, but he would clarify that § 512(f)'s requirement that a misrepresentation be knowing is satisfied when a party knows that it is ignorant of the truth or falsity of the misrepresentation. He also would hold that defendants' actions were insufficient as a matter of law to form a subjective good-faith belief that plaintiff's video was not a fair use.

---

**COUNSEL**

Kelly M. Klaus (argued) and Melinda LeMoine, Munger, Tolles & Olson LLP, Los Angeles, California, for Defendants-Appellants/Cross-Appellees.

Corynne McSherry (argued), Cindy Cohn, Kurt Opsahl, Daniel K. Nazer, and Julie Samuels, Electronic Frontier Foundation, San Francisco, California; Ashok Ramani, Michael S. Kwun, and Theresa H. Nguyen, Keker & Van Nest LLP, San Francisco, California, for Plaintiff-Appellee/Cross-Appellant.

Steven Fabrizio and Scott Wilkens, Jenner & Block LLP, Washington, D.C., for Amicus Curiae Motion Picture Association of America, Inc.

Jennifer Pariser, Of Counsel, Recording Industry Association of America, Washington, D.C.; Cynthia Arato, Marc Isserles, and Jeremy Licht, Shapiro, Arato & Isserles LLP, New York, New York, for Amicus Curiae Recording Industry Association of America.

Joseph Gratz, Durie Tangri LLP, San Francisco, California, for Amici Curiae Google Inc., Twitter Inc., and Tumblr, Inc.

Marvin Ammori and Lavon Ammori, Ammori Group, Washington, D.C., for Amicus Curiae Automatic, Inc.

Julie Ahrens and Timothy Greene, Stanford Law School Center for Internet and Society, Stanford, California, for Amici Curiae Organization for Transformative Works, Public Knowledge, and International Documentary Association.

Catherine R. Gellis, Sausalito, California, for Amicus Curiae Organization for Transformative Works.

**ORDER**

The opinion and dissent filed on September 14, 2015 and published at 801 F.3d 1126 are hereby amended. The amended opinion and dissent are filed concurrently with this order.

With these amendments, the panel has voted to deny Universal's petition for panel rehearing and Lenz's petition

for panel rehearing. Judge Tallman and Judge Murguia have voted to deny Lenz's petition for rehearing en banc, and Judge M. Smith has voted to grant Lenz's petition for rehearing en banc.

The full court has been advised of the petition for rehearing en banc. No judge has requested a vote on whether to rehear the matter en banc. Fed. R. App. P. 35(b).

Universal's petition for panel rehearing is **DENIED**. Lenz's petition for panel rehearing or rehearing en banc is **DENIED**. No future petitions for panel rehearing or petitions for rehearing en banc will be entertained.

---

**OPINION**

TALLMAN, Circuit Judge:

Stephanie Lenz filed suit under 17 U.S.C. § 512(f)—part of the Digital Millennium Copyright Act ("DMCA")—against Universal Music Corp., Universal Music Publishing, Inc., and Universal Music Publishing Group (collectively "Universal"). She alleges Universal misrepresented in a takedown notification that her 29-second home video (the "video") constituted an infringing use of a portion of a composition by the Artist known as Prince, which Universal insists was unauthorized by the law. Her claim boils down to a question of whether copyright holders have been abusing the extrajudicial takedown procedures provided for in the DMCA by declining to first evaluate whether the content qualifies as fair use. We hold that the statute requires copyright holders to consider fair use before sending a

takedown notification, and that in this case, there is a triable issue as to whether the copyright holder formed a subjective good faith belief that the use was not authorized by law. We affirm the denial of the parties' cross-motions for summary judgment.

## I

Founded in May 2005, YouTube (now owned by Google) operates a website that hosts user-generated content. *About YouTube*, YouTube.com, https://www. youtube.com/yt/about/ (last visited September 4, 2015). Users upload videos directly to the website. *Id.* On February 7, 2007, Lenz uploaded to YouTube a 29-second home video of her two young children in the family kitchen dancing to the song *Let's Go Crazy* by Prince.[1] Available at https://www.youtube.com/ watch?v=N1Kf JHFWlhQ (last visited September 4, 2015). She titled the video "'Let's Go Crazy' #1." About four seconds into the video, Lenz asks her thirteen month-old son "what do you think of the music?" after which he bobs up and down while holding a push toy.

At the time Lenz posted the video, Universal was Prince's publishing administrator responsible for enforcing his copyrights. To accomplish this objective with respect to YouTube, Robert Allen, Universal's head of business affairs, assigned Sean Johnson, an assistant in the legal department, to monitor YouTube on a daily basis. Johnson searched YouTube for Prince's songs and reviewed the video postings

---

[1] YouTube is a for-profit company that generates revenues by selling advertising. If users choose to become "content partners" with YouTube, they share in a portion of the advertising revenue generated. Lenz is not a content partner and no advertisements appear next to the video.

returned by his online search query. When reviewing such videos, he evaluated whether they "embodied a Prince composition" by making "significant use of . . . the composition, specifically if the song was recognizable, was in a significant portion of the video or was the focus of the video." According to Allen, "[t]he general guidelines are that . . . we review the video to ensure that the composition was the focus and if it was we then notify YouTube that the video should be removed."

Johnson contrasted videos that met this criteria to those "that may have had a second or less of a Prince song, literally a one line, half line of Prince song" or "were shot in incredibly noisy environments, such as bars, where there could be a Prince song playing deep in the background . . . to the point where if there was any Prince composition embodied . . . in those videos that it was distorted beyond reasonable recognition." None of the video evaluation guidelines explicitly include consideration of the fair use doctrine.

When Johnson reviewed Lenz's video, he recognized *Let's Go Crazy* immediately. He noted that it played loudly in the background throughout the entire video. Based on these details, the video's title, and Lenz's query during the video asking if her son liked the song, he concluded that Prince's song "was very much the focus of the video." As a result, Johnson decided the video should be included in a takedown notification sent to YouTube that listed more than 200 YouTube videos Universal believed to be making

unauthorized use of Prince's songs.[2]  The notice included a "good faith belief" statement as required by 17 U.S.C. § 512(c)(3)(A)(v): "We have a good faith belief that the above-described activity is not authorized by the copyright owner, its agent, or the law."

After receiving the takedown notification, YouTube removed the video and sent Lenz an email on June 5, 2007, notifying her of the removal.  On June 7, 2007, Lenz attempted to restore the video by sending a counter-notification to YouTube pursuant to § 512(g)(3).  After YouTube provided this counter-notification to Universal per § 512(g)(2)(B), Universal protested the video's reinstatement because Lenz failed to properly acknowledge that her statement was made under penalty of perjury, as required by § 512(g)(3)(C).  Universal's protest reiterated that the video constituted infringement because there was no record that "either she or YouTube were ever granted licenses to reproduce, distribute, publicly perform or otherwise exploit the Composition."  The protest made no mention of fair use.  After obtaining *pro bono* counsel, Lenz sent a second counter-notification on June 27, 2007, which resulted in YouTube's reinstatement of the video in mid-July.

## II

Lenz filed the instant action on July 24, 2007, and her Amended Complaint on August 15, 2007.  After the district court dismissed her tortious interference claim and request for

---

[2] "[T]he parties do not dispute that Lenz used copyrighted material in her video or that Universal is the true owner of Prince's copyrighted music." *Lenz v. Universal Music Corp.*, 572 F. Supp. 2d 1150, 1153–54 (N.D. Cal. 2008).

declaratory relief, Lenz filed her Second Amended Complaint on April 18, 2008, alleging only a claim for misrepresentation under § 512(f). The district court denied Universal's motion to dismiss the action.

On February 25, 2010, the district court granted Lenz's partial motion for summary judgment on Universal's six affirmative defenses, including the third affirmative defense that Lenz suffered no damages. Both parties subsequently moved for summary judgment on Lenz's § 512(f) misrepresentation claim. On January 24, 2013, the district court denied both motions in an order that is now before us.

The district court certified its summary judgment order for interlocutory appeal under 28 U.S.C. § 1292(b), and stayed proceedings in district court pending resolution of the appeal. We granted the parties permission to bring an interlocutory appeal.

### III

We review *de novo* the district court's denial of summary judgment. When doing so, we "must determine whether the evidence, viewed in a light most favorable to the non-moving party, presents any genuine issues of material fact and whether the district court correctly applied the law." *Warren v. City of Carlsbad*, 58 F.3d 439, 441 (9th Cir. 1995). On cross-motions for summary judgment, we evaluate each motion independently, "giving the nonmoving party in each instance the benefit of all reasonable inferences." *ACLU v. City of Las Vegas*, 333 F.3d 1092, 1097 (9th Cir. 2003).

When evaluating an interlocutory appeal, we "may address any issue fairly included within the certified order

because it is the *order* that is appealable, and not the controlling question identified by the district court." *Yamaha Motor Corp., U.S.A. v. Calhoun*, 516 U.S. 199, 205 (1996) (emphasis in original) (quotation omitted). We may therefore "address those issues *material* to the order from which appeal has been taken." *In re Cinematronics, Inc.*, 916 F.2d 1444, 1449 (9th Cir. 1990) (emphasis in original) (permitting appellate review of a ruling issued prior to the order certified for interlocutory appeal).

## IV

Effective on October 28, 1998, the DMCA added new sections to existing copyright law by enacting five Titles, only one of which is relevant here: Title II—Online Copyright Infringement Liability Limitation Act—now codified in 17 U.S.C. § 512. Sections 512(c), (f), and (g) are at the heart of the parties' dispute.

## A

Section 512(c) permits service providers, e.g., YouTube or Google, to avoid copyright infringement liability for storing users' content if—among other requirements—the service provider "expeditiously" removes or disables access to the content after receiving notification from a copyright holder that the content is infringing. 17 U.S.C. § 512(c). Section 512(c)(3)(A) sets forth the elements that such a "takedown notification" must contain. These elements include identification of the copyrighted work, identification of the allegedly infringing material, and, critically, a statement that the copyright holder believes in good faith the infringing material "is not authorized by the copyright owner, its agent, or the law." *Id.* § 512(c)(3)(A). The procedures

outlined in § 512(c) are referred to as the DMCA's "takedown procedures."

To avoid liability for disabling or removing content, the service provider must notify the user of the takedown. *Id.* § 512(g)(1)–(2). The user then has the option of restoring the content by sending a counter-notification, which must include a statement of "good faith belief that the material was removed or disabled as a result of mistake or misidentification . . . ." *Id.* § 512(g)(3)(C). Upon receipt of a valid counter-notification, the service provider must inform the copyright holder of the counter-notification and restore the content within "not less than 10, nor more than 14, business days," unless the service provider receives notice that the copyright holder has filed a lawsuit against the user seeking to restrain the user's infringing behavior. *Id.* § 512(g)(2)(B)–(C). The procedures outlined in § 512(g) are referred to as the DMCA's "put-back procedures."

If an entity abuses the DMCA, it may be subject to liability under § 512(f). That section provides: "Any person who knowingly materially misrepresents under this section—(1) that material or activity is infringing, or (2) that material or activity was removed or disabled by mistake or misidentification, shall be liable for any damages . . . ." *Id.* § 512(f). Subsection (1) generally applies to copyright holders and subsection (2) generally applies to users. Only subsection (1) is at issue here.

**B**

We must first determine whether 17 U.S.C. § 512(c)(3)(A)(v) requires copyright holders to consider whether the potentially infringing material is a fair use of a

copyright under 17 U.S.C. § 107 before issuing a takedown notification. Section 512(c)(3)(A)(v) requires a takedown notification to include a "statement that the complaining party has a good faith belief that the use of the material in the manner complained of is not authorized by the copyright owner, its agent, or the law." The parties dispute whether fair use is an authorization under the law as contemplated by the statute—which is so far as we know an issue of first impression in any circuit across the nation. "Canons of statutory construction dictate that if the language of a statute is clear, we look no further than that language in determining the statute's meaning. . . . A court looks to legislative history only if the statute is unclear." *United States v. Lewis*, 67 F.3d 225, 228–29 (9th Cir. 1995) (citations omitted). We agree with the district court and hold that the statute unambiguously contemplates fair use as a use authorized by the law.

Fair use is not just excused by the law, it is wholly authorized by the law. In 1976, Congress codified the application of a four-step test for determining the fair use of copyrighted works:

> Notwithstanding the provisions of sections 106 and 106A, *the fair use of a copyrighted work*, . . . for purposes such as criticism, comment, news reporting, teaching (including multiple copies for classroom use), scholarship, or research, *is not an infringement of copyright*. In determining whether the use made of a work in any particular case is a fair use the factors to be considered shall include—

(1) the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes;

(2) the nature of the copyrighted work;

(3) the amount and substantiality of the portion used in relation to the copyrighted work as a whole; and

(4) the effect of the use upon the potential market for or value of the copyrighted work.

The fact that a work is unpublished shall not itself bar a finding of fair use if such finding is made upon consideration of all the above factors.

17 U.S.C. § 107 (emphasis added). The statute explains that the fair use of a copyrighted work is permissible because it is a non-infringing use.

While Title 17 of the United States Code ("Copyrights") does not define the term "authorize" or "authorized," "[w]hen there is no indication that Congress intended a specific legal meaning for the term, the court may look to sources such as dictionaries for a definition." *United States v. Mohrbacher*, 182 F.3d 1041, 1048 (9th Cir. 1999). Black's Law Dictionary defines "authorize" as "1. To give legal authority; to empower" and "2. To formally approve; to sanction." *Authorize*, Black's Law Dictionary (10th ed. 2014). Because 17 U.S.C. § 107 both "empowers" and "formally approves"

the use of copyrighted material if the use constitutes fair use, fair use is "authorized by the law" within the meaning of § 512(c). *See also* 17 U.S.C. § 108(f)(4) ("Nothing in this section in any way affects the *right* of fair use as provided by section 107 . . . ." (emphasis added)).

Universal's sole textual argument is that fair use is not "authorized by the law" because it is an affirmative defense that excuses otherwise infringing conduct. Universal's interpretation is incorrect as it conflates two different concepts: an affirmative defense that is labeled as such due to the procedural posture of the case, and an affirmative defense that excuses impermissible conduct. Supreme Court precedent squarely supports the conclusion that fair use does not fall into the latter camp: "[A]nyone who . . . makes a fair use of the work is not an infringer of the copyright with respect to such use." *Sony Corp. of Am. v. Universal City Studios, Inc.*, 464 U.S. 417, 433 (1984).

Given that 17 U.S.C. § 107 expressly authorizes fair use, labeling it as an affirmative defense that excuses conduct is a misnomer:

> Although the traditional approach is to view "fair use" as an affirmative defense, this writer, speaking only for himself, is of the opinion that it is better viewed as a right granted by the Copyright Act of 1976. Originally, as a judicial doctrine without any statutory basis, fair use was an infringement that was excused—this is presumably why it was treated as a defense. As a statutory doctrine, however, fair use is not an infringement. Thus, since the passage of the

> 1976 Act, fair use should no longer be considered an infringement to be excused; instead, it is logical to view fair use as a right. Regardless of how fair use is viewed, it is clear that the burden of proving fair use is always on the putative infringer.

*Bateman v. Mnemonics, Inc.*, 79 F.3d 1532, 1542 n.22 (11th Cir. 1996) (Birch, J.). We agree. *Cf.* Lydia Pallas Loren, *Fair Use: An Affirmative Defense?*, 90 Wash. L. Rev. 685, 688 (2015) ("Congress did not intend fair use to be an affirmative defense—a defense, yes, but not an affirmative defense."). Fair use is therefore distinct from affirmative defenses where a use infringes a copyright, but there is no liability due to a valid excuse, e.g., misuse of a copyright, *Practice Management  Information Corp. v. American Medical Ass'n*, 121 F.3d 516, 520 (9th Cir. 1997), and laches, *Danjaq LLC v. Sony Corp.*, 263 F.3d 942, 950–51 (9th Cir. 2001).

Universal concedes it must give due consideration to other uses authorized by law such as compulsory licenses. The introductory language in 17 U.S.C. § 112 for compulsory licenses closely mirrors that in the fair use statute. *Compare* 17 U.S.C. § 112(a)(1) ("Notwithstanding the provisions of section 106, . . . it is not an infringement of copyright for a transmitting organization entitled to transmit to the public a performance or display of a work . . . to make no more than one copy or phonorecord of a particular transmission program embodying the performance or display . . . ."), *with id.* § 107 ("Notwithstanding the provisions of sections 106 and 106A, the fair use of a copyrighted work . . . is not an infringement of copyright."). That fair use may be labeled as an affirmative defense due to the procedural posture of the case is no

different than labeling a license an affirmative defense for the same reason. *Compare Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 573 & n.3, 590 (1994) (stating that "fair use is an affirmative defense" where the district court converted a motion to dismiss based on fair use into a motion for summary judgment), *with A&M Records, Inc. v. Napster, Inc.*, 239 F.3d 1004, 1025–26 (9th Cir. 2001) ("Napster contends that . . . the district court improperly rejected valid affirmative defenses of . . . implied license . . . ."). Thus, Universal's argument that it need not consider fair use in addition to compulsory licenses rings hollow.

Even if, as Universal urges, fair use is classified as an "*affirmative* defense," we hold—for the purposes of the DMCA—fair use is uniquely situated in copyright law so as to be treated differently than traditional affirmative defenses. We conclude that because 17 U.S.C. § 107 created a type of non-infringing use, fair use is "authorized by the law" and a copyright holder must consider the existence of fair use before sending a takedown notification under § 512(c).

## C

We must next determine if a genuine issue of material fact exists as to whether Universal knowingly misrepresented that it had formed a good faith belief the video did not constitute fair use. This inquiry lies not in whether a court would adjudge the video as a fair use, but whether Universal formed a good faith belief that it was not. Contrary to the district court's holding, Lenz may proceed under an actual knowledge theory, but not under a willful blindness theory.

**1**

Though Lenz argues Universal should have known the video qualifies for fair use as a matter of law, we have already decided a copyright holder need only form a subjective good faith belief that a use is not authorized. *Rossi v. Motion Picture Ass'n of Am. Inc.*, 391 F.3d 1000 (9th Cir. 2004). In *Rossi*, we explicitly held that "the 'good faith belief' requirement in § 512(c)(3)(A)(v) encompasses a subjective, rather than objective standard," and we observed that "Congress understands this distinction." *Id.* at 1004. We further held:

> When enacting the DMCA, Congress could have easily incorporated an objective standard of reasonableness. The fact that it did not do so indicates an intent to adhere to the subjective standard traditionally associated with a good faith requirement. . . .

> In § 512(f), Congress included an expressly limited cause of action for improper infringement notifications, imposing liability only if the copyright owner's notification is a knowing misrepresentation. A copyright owner cannot be liable simply because an unknowing mistake is made, even if the copyright owner acted unreasonably in making the mistake. Rather, there must be a demonstration of some actual knowledge of misrepresentation on the part of the copyright owner.

*Id.* at 1004–05 (citations omitted). Neither of these holdings are dictum. *See United States v. Johnson*, 256 F.3d 895, 914 (9th Cir. 2001) (en banc) ("[W]here a panel confronts an issue germane to the eventual resolution of the case, and resolves it after reasoned consideration in a published opinion, that ruling becomes the law of the circuit, regardless of whether doing so is necessary in some strict logical sense."). We therefore judge Universal's actions by the subjective beliefs it formed about the video.

**2**

Universal faces liability if it knowingly misrepresented in the takedown notification that it had formed a good faith belief the video was not authorized by the law, i.e., did not constitute fair use. Here, Lenz presented evidence that Universal did not form any subjective belief about the video's fair use—one way or another— because it failed to consider fair use at all, and knew that it failed to do so. Universal nevertheless contends that its procedures, while not formally labeled consideration of fair use, were tantamount to such consideration. Because the DMCA requires consideration of fair use prior to sending a takedown notification, a jury must determine whether Universal's actions were sufficient to form a subjective good faith belief about the video's fair use or lack thereof.[3]

---

[3] Although the panel agrees on the legal principles we discuss herein, we part company with our dissenting colleague over the propriety of resolving on summary judgment Universal's claim to subjective belief that the copyright was infringed. The dissent would find that no triable issue of fact exists because Universal did not specifically and expressly consider the fair-use elements of 17 U.S.C. § 107. But the question is whether the analysis Universal did conduct of the video was sufficient, not to conclusively establish as a matter of law that the video's use of *Let's Go*

To be clear, if a copyright holder ignores or neglects our unequivocal holding that it must consider fair use before sending a takedown notification, it is liable for damages under § 512(f).  If, however, a copyright holder forms a subjective *good faith* belief the allegedly infringing material does not constitute fair use, we are in no position to dispute the copyright holder's belief even if we would have reached the opposite conclusion.  A copyright holder who pays lip service to the consideration of fair use by claiming it formed a good faith belief when there is evidence to the contrary is still subject to § 512(f) liability.  *Cf. Disney Enters., Inc. v. Hotfile Corp.*, No. 11-cv-20427, 2013 WL 6336286, at *48 (S.D. Fla. Sept. 20, 2013) (denying summary judgment of § 512(f) counterclaim due to "sufficient evidence in the record to suggest that [Plaintiff] Warner intentionally targeted files it knew it had no right to remove"); *Rosen v. Hosting Servs., Inc.*, 771 F. Supp. 2d 1219, 1223 (C.D. Cal. 2010) (denying summary judgment of § 512(f) counterclaim where the takedown notification listed four URL links that did not contain content matching the description of the purportedly infringed material); *Online Policy Grp. v. Diebold, Inc.*, 337 F. Supp. 2d 1195, 1204–05 (N.D. Cal. 2004) ("[T]here is no genuine issue of fact that Diebold knew—and indeed that it specifically intended—that its letters to OPG and Swarthmore would result in prevention of publication of that content. . . . The fact that Diebold never actually brought suit against any alleged infringer suggests strongly that Diebold sought to use the DMCA's safe harbor provisions—which were designed to protect ISPs, not copyright holders—as a

*Crazy* was fair, but to form a subjective good faith belief that the video was infringing on Prince's copyright.  And under the circumstances of this case, that question is for the jury, not this court, to decide.

sword to suppress publication of embarrassing content rather than as a shield to protect its intellectual property.").

**3**

We hold the willful blindness doctrine may be used to determine whether a copyright holder "knowingly materially misrepresent[ed]" that it held a "good faith belief" the offending activity was not a fair use. *See* 17 U.S.C. § 512(c)(3)(A)(v), (f). "[T]he willful blindness doctrine may be applied, in appropriate circumstances, to demonstrate knowledge or awareness of specific instances of infringement under the DMCA." *Viacom Int'l, Inc. v. YouTube, Inc.*, 676 F.3d 19, 35 (2d Cir. 2012) (interpreting how a party can establish the "actual knowledge"—a subjective belief—required by § 512(c)(1)(A)(I)); *see also UMG Recordings, Inc. v. Shelter Capital Partners LLC*, 718 F.3d 1006, 1023 (9th Cir. 2013) ("Of course, a service provider cannot willfully bury its head in the sand to avoid obtaining such specific knowledge." (citing *Viacom*, 676 F.3d at 31)). But, based on the specific facts presented during summary judgment, we reject the district court's conclusion that Lenz may proceed to trial under a willful blindness theory.

To demonstrate willful blindness a plaintiff must establish two factors: "(1) the defendant must subjectively believe that there is a high probability that a fact exists and (2) the defendant must take deliberate actions to avoid learning of that fact." *Global-Tech Appliances, Inc. v. SEB S.A.*, 131 S. Ct. 2060, 2070 (2011). "Under this formulation, a willfully blind defendant is one who takes deliberate actions to avoid confirming a high probability of wrongdoing and who can almost be said to have actually known the critical facts." *Id.* at 2070–71. To meet the *Global-Tech* test, Lenz must

demonstrate a genuine issue as to whether—before sending the takedown notification—Universal (1) subjectively believed there was a high probability that the video constituted fair use, and (2) took deliberate actions to avoid learning of this fair use.

On summary judgment Lenz failed to meet a threshold showing of the first factor. To make such a showing, Lenz must provide evidence from which a juror could infer that Universal was aware of a high probability the video constituted fair use. *See United States v. Yi*, 704 F.3d 800, 805 (9th Cir. 2013). But she failed to provide any such evidence. The district court therefore correctly found that "Lenz does not present evidence suggesting Universal subjectively believed either that there was a high probability any given video might make fair use of a Prince composition or her video in particular made fair use of Prince's song 'Let's Go Crazy.'" Yet the district court improperly denied Universal's motion for summary judgment on the willful blindness theory because Universal "has not shown that it *lacked* a subjective belief." By finding blame with Universal's inability to show that it "*lacked* a subjective belief," the district court improperly required Universal to meet its burden of persuasion, even though Lenz had failed to counter the initial burden of production that Universal successfully carried. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Nissan Fire & Marine Ins. Co. v. Fritz Cos., Inc.*, 210 F.3d 1099, 1102 (9th Cir. 2000). Lenz may not therefore proceed to trial on a willful blindness theory.

## V

Section 512(f) provides for the recovery of "any damages, including costs and attorneys['] fees, incurred by the alleged

infringer . . . who is injured by such misrepresentation, as the result of the service provider relying upon such misrepresentation in removing or disabling  access to the material or activity claimed to be infringing . . . ."  17 U.S.C. § 512(f).  We hold a plaintiff may seek recovery of nominal damages for an injury incurred as a result of a § 512(f) misrepresentation.

Universal incorrectly asserts that Lenz must demonstrate she incurred "actual monetary loss."  Section 512(k) provides a definition for "monetary relief" as "damages, costs, attorneys['] fees, and any other form of monetary payment."  The term "monetary relief" appears in § 512(a), (b)(1), (c)(1), and (d), but is notably absent from § 512(f).  As a result, the damages an alleged infringer may recover under § 512(f) from "any person" are broader than monetary relief.[4]  *Cf. United States v. James*, 478 U.S. 597, 605 (1986) ("Congress' choice of the language '*any* damage' . . . undercuts a narrow construction."), *abrogated on other grounds by Cent. Green Co. v. United States*, 531 U.S. 425 (2001).  Because Congress specified the recovery of "any damages," we reject Universal's contention that Congress did not indicate its intent to depart from the common law presumption that a misrepresentation plaintiff must have suffered a monetary loss.  *See Keene Corp. v. United States*, 508 U.S. 200, 208 (1993) ("Where Congress includes particular language in one section of a statute but omits it in another, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." (quotation omitted)).

---

[4] Title I of the DMCA specifies recovery for "actual damages." 17 U.S.C. § 1203(c)(1)(A).  If Congress intended to similarly limit the recovery of § 512(f) damages to pecuniary losses, it could have chosen to do so.

Lenz may seek recovery of nominal damages due to an unquantifiable harm suffered as a result of Universal's actions.[5] The DMCA is akin to a statutorily created intentional tort whereby an individual may recover nominal damages for a "knowingly material misrepresent[ation] under this section [512]." 17 U.S.C. § 512(f); *cf. Memphis Cmty. Sch. Dist. v. Stachura*, 477 U.S. 299, 305 (1986) ("We have repeatedly noted that 42 U.S.C. § 1983 creates a species of tort liability in favor of persons who are deprived of rights, privileges, or immunities secured to them by the Constitution. Accordingly, when § 1983 plaintiffs seek damages for violations of constitutional rights, the level of damages is ordinarily determined according to principles derived from the common law of torts." (quotation and citations omitted)).

"In a number of common law actions associated with intentional torts, the violation of the plaintiff's right has generally been regarded as a kind of legal damage in itself. The plaintiff who proves an intentional physical tort to the person or to property can always recover nominal damages." 3 Dan B. Dobbs et al., *The Law of Torts* § 480 (2d ed. 2011). The tort need not be physical in order to recover nominal damages. Defamation, for example, permits the recovery of nominal damages:

> A nominal damage award can be justified in a
> tort action only if there is some reason for
> awarding a judgment in favor of a claimant
> who has not proved or does not claim a

---

[5] Lenz may not recover nominal damages for "impairment of free speech rights." No authority supports the recovery of nominal damages caused by a private actor's chilling of free speech rights. All of the cases Lenz cites address challenges to governmental action.

> compensable loss with sufficient certainty to
> justify a recovery of compensatory or actual
> damages. There may be such a reason in an
> action for defamation, since a nominal
> damage award serves the purpose of
> vindicating the plaintiff's character by a
> verdict of the jury that establishes the falsity
> of the defamatory matter.

W. Page Keeton et al., *Prosser and Keeton on Torts* § 116A,
at 845 (5th ed. 1984). Also, individuals may recover nominal
damages for trespass to land, even though the trespasser's
"presence on the land causes no harm to the land [or] its
possessor . . . ." Restatement (Second) of Torts § 163 &
cmts. d, e (1965).

The district court therefore properly concluded in its 2010
order:

> The use of "any damages" suggests strongly
> Congressional intent that recovery be
> available for damages even if they do not
> amount to . . . substantial economic damages
> . . . . Requiring a plaintiff who can [show
> that the copyright holder knowingly
> misrepresented its subjective good faith] to
> demonstrate in addition not only that she
> suffered damages but also that those damages
> were economic and substantial would vitiate
> the deterrent effect of the statute.

*Lenz v. Universal Music Corp.*, No. C 07-3783 JF, 2010 WL
702466, at *10 (N.D. Cal., Feb. 25, 2010). Relying on this
opinion, the Southern District of Florida held the same.

*Hotfile*, 2013 WL 6336286, at \*48 ("[T]he Court observes that the quantity of economic damages to Hotfile's system is necessarily difficult to measure with precision and has led to much disagreement between the parties and their experts. Notwithstanding this difficulty, the fact of injury has been shown, and Hotfile's expert can provide the jury with a non-speculative basis to assess damages.").

We agree that Lenz may vindicate her statutorily created rights by seeking nominal damages. Because a jury has not yet determined whether Lenz will prevail at trial, we need not decide the scope of recoverable damages, i.e., whether she may recover expenses following the initiation of her § 512(f) suit or *pro bono* costs and attorneys' fees, both of which arose as a result of the injury incurred.

## VI

Copyright holders cannot shirk their duty to consider—in good faith and prior to sending a takedown notification—whether allegedly infringing material constitutes fair use, a use which the DMCA plainly contemplates as authorized by the law. That this step imposes responsibility on copyright holders is not a reason for us to reject it. *Cf. Consumer Prod. Safety Comm'n v. GTE Sylvania, Inc.*, 447 U.S. 102, 123–24 (1980) ("[A]ny increased burdens imposed on the Commission as a result of its compliance with [the Consumer Product Safety Act] were intended by Congress in striking an appropriate balance between the interests of consumers and the need for fairness and accuracy with respect to information disclosed by the Commission. Thus, petitioners' claim that the Commission's compliance with the requirements of [the Act] will impose undue burdens on the Commission is properly addressed to Congress, not to this Court."). We

affirm the district court's order denying the parties' cross-motions for summary judgment.

**AFFIRMED.**  Each party shall bear its own costs.

M. SMITH, Circuit Judge, concurring in part and dissenting in part:

I concur in all but Part IV.C of the majority opinion. However, I disagree with the majority's conclusion that "whether Universal's actions were sufficient to form a subjective good faith belief about the video's fair use or lack thereof" presents a triable issue of fact. Universal admittedly did not consider fair use before notifying YouTube to take down Lenz's video. It therefore could not have formed a good faith belief that Lenz's video was infringing, and its notification to the contrary was a knowing material misrepresentation. Accordingly, I would hold that Lenz is entitled to summary judgment.

I agree with the majority's conclusion that § 512(c)(3)(A)(v) requires copyright holders to consider whether potentially infringing material is a fair use before issuing a takedown notice. As the majority explains, a takedown notice must contain "[a] statement that the complaining party has a good faith belief that use of the material in the manner complained of is not authorized by the copyright owner, its agent, or the law." 17 U.S.C. § 512(c)(3)(A)(v). Because fair use of copyrighted material is not an infringement of copyright, such use is "authorized by . . . the law." *See id.* § 107.  Therefore, in order to form "a good faith belief that use of the material in the manner

complained of is not authorized by . . . the law," § 512(c)(3)(A)(v), a party must consider the doctrine of fair use. I also agree with the majority that § 512(f) provides a party injured by a violation of § 512(c)(3)(A)(v) with a right of action for damages, including nominal damages.

However, I part ways with the majority on two issues. First, I would clarify that § 512(f)'s requirement that a misrepresentation be "knowing[]" is satisfied when the party knows that it is ignorant of the truth or falsity of its representation. Second, I would hold that Universal's actions were insufficient as a matter of law to form a subjective good-faith belief that Lenz's video was not a fair use.

# I

Section 512(f) requires that a misrepresentation be "knowing[]" to incur liability. In my view, when the misrepresentation concerns § 512(c)(3)(A)(v), the knowledge requirement is satisfied when the party knows that it has not considered fair use. That is, Universal need not have known that the video was a fair use, or that its actions were insufficient to form a good-faith belief about fair use. It need only have known that it had not considered fair use as such.[1]

As the majority explains, we have previously held in *Rossi v. Motion Picture Ass'n of Am. Inc.* that "the 'good faith belief' requirement in § 512(c)(3)(A)(v) encompasses a

---

[1] I do not believe that, in this regard, my construction conflicts with that of the majority. Although the majority does not squarely address § 512(f)'s scienter requirement, it leaves for the jury only the question "whether Universal's actions were sufficient to form a subjective good faith belief about the video's fair use or lack thereof."

subjective, rather than objective, standard." 391 F.3d 1000, 1004 (9th Cir. 2004). *Rossi* reasoned that a subjective standard comported with § 512(f)'s requirement that actionable misrepresentations be "knowing[]", and ultimately held that liability under § 512(f) requires "a demonstration of some actual knowledge of misrepresentation on the part of the copyright owner." 391 F.3d at 1005.

Universal urges us to construe *Rossi* to mean that liability attaches under § 512(f) only if a party subjectively believes that its assertion is false. But under long-settled principles of deceit and fraudulent misrepresentation, a party need only know that it is ignorant of the truth or falsity of its representation for its misrepresentation to be knowing. For example, in *Cooper v. Schlesinger*, 111 U.S. 148, 155 (1884), the Supreme Court explained that "a statement recklessly made, without knowledge of its truth, [is] a false statement knowingly made, within the settled rule."[2] Similarly, under the common law, "[a] misrepresentation is fraudulent if the maker . . . knows or believes that the matter is not as he represents it to be, . . . [or] *knows that he does not have the basis for his representation that he states or implies*." Restatement (Second) of Torts § 526 (emphasis added).[3]

---

[2] *See also Sovereign Pocahontas Co. v. Bond*, 120 F.2d 39, 39–40 (D.C. Cir. 1941); *Knickerbocker Merch. Co. v. United States*, 13 F.2d 544, 546 (2d Cir. 1926); *L J Mueller Furnace Co. v. Cascade Foundry Co.*, 145 F. 596, 600 (3d Cir. 1906); *Hindman v. First Nat'l Bank*, 112 F. 931, 944 (6th Cir. 1902).

[3] The Second Restatement refers to "fraudulent misrepresentation," rather than "knowing" misrepresentation. *See* Restatement (Second) of Torts § 526. However, as the Restatement clarifies, the requirement that a misrepresentation be "fraudulent" refers "solely" to the party's *knowledge* of misrepresentation. *See id*. cmt. a. The Restatement's

One who asserts a belief that a work is infringing without considering fair use lacks a basis for that belief. It follows that one who *knows* that he has not considered fair use *knows* that he lacks a basis for that belief. That is sufficient "actual knowledge of misrepresentation" to meet the scienter requirement of § 512(f). *See Rossi*, 391 F.3d at 1005. Thus, to be held liable under § 512(f), Universal need only have failed to consider fair use, and known that it had failed to consider fair use.

## II

It is undisputed that Universal's policy was to issue a takedown notice where a copyrighted work was used as "the focus of the video" or "prominently featured in the video." By Universal's own admission, its agents were not instructed to consider whether the use was fair. Instead, Universal directed its agents to spare videos that had "a second or less of a Prince song" or where the song was "distorted beyond reasonable recognition." And yet, from this, the majority concludes that "whether Universal's actions were sufficient to form a subjective good faith belief about the video's fair use or lack thereof" presents a triable issue of fact.

I respectfully disagree. The Copyright Act explicitly enumerates the factors to be considered in assessing whether use of copyrighted material is fair. 17 U.S.C. § 107. Universal's policy was expressly to determine whether a video made "significant use"—not *fair* use—of the work. Nothing in Universal's methodology considered the purpose and character of the use, the commercial or noncommercial

definition of "fraudulent" is therefore persuasive authority for construing the meaning of "knowingly."

nature of the use, or whether the use would have a significant impact on the market for the copyrighted work.[4] *See* § 107. There is therefore no disputed issue of fact: Universal did *not* consider fair use before issuing a takedown notice.

Moreover, Universal *knew* it had not considered fair use, because § 107 explicitly supplies the factors that "shall" be considered in determining whether a use is fair. *Id*. I see no reason in law or logic to excuse copyright holders from the general principle that knowledge of the law is presumed. *See United States v. Int'l Minerals & Chem. Corp.*, 402 U.S. 558, 562–63 (1971) (holding that the use of the word "knowingly" did not evince a legislative intent to "carv[e] out an exception to the general rule that ignorance of the law is no excuse"). As explained above, that is sufficient in my view to conclude that Universal's takedown notice was a knowing misrepresentation.

Based on *Rossi*'s holding that a subjective good-faith belief in infringement is sufficient to satisfy § 512(c)(3)(A)(v), 391 F.3d at 1005, the majority disagrees. But the majority's reading of *Rossi* would insulate from

---

[4] Had Universal properly considered the statutory elements of fair use, there is no doubt that it would have concluded that Lenz's use of *Let's Go Crazy* was fair. *See, e.g.*, *TCA Television Corp. v. McCollum*, 2015 WL 9255341 (S.D.N.Y. Dec. 17, 2015) (finding on a motion to dismiss that the use in a Broadway show of one minute and seven seconds of the Abbott and Costello routine *Who's On First?* was fair because the use was "highly transformative" and unlikely to usurp the market for the original); *SOFA Entm't, Inc. v. Dodger Prods., Inc.*, 709 F.3d 1273 (9th Cir. 2013) (affirming summary judgment that use of a seven-second clip of *The Ed Sullivan Show* was fair for similar reasons). Universal's "significant use" analysis, by contrast, is more like determining whether a use is *de minimis*, a much more stringent test than fair use. *See Sandoval v. New Line Cinema Corp.*, 147 F.3d 215, 217 (2d Cir. 1998).

liability *any* subjective belief in infringement, no matter how poorly formed. *Rossi* did not abrogate the statutory requirement that the belief be held in good faith. I would therefore hold that a belief in infringement formed consciously without considering fair use is no good-faith belief at all. *See Cooper*, 111 U.S. at 155 (holding that such a belief is a knowing misrepresentation). And to assert in good faith that a use is not fair, a party must consider the statutory elements of fair use set forth in § 107. Merely evaluating whether a use is "significant" is not enough.

The majority's unfortunate interpretation of § 512(f) would permit a party to avoid liability with only the most perfunctory attention to fair use. Such a construction eviscerates § 512(f) and leaves it toothless against frivolous takedown notices. And, in an era when a significant proportion of media distribution and consumption takes place on third-party safe harbors such as YouTube,[5] if a creative work can be taken down without meaningfully considering fair use, then the viability of the concept of fair use itself is in jeopardy. Such a construction of § 512(f) cannot comport with the intention of Congress.

* * *

In sum: Universal represented that it had formed a good-faith belief that Lenz's video was an infringement of copyright—that is, that the video was not fair use. Because

---

[5] *See Statistics*, *YouTube*, https://www.youtube.com/yt/press/statistics.html (last visited Feb. 2, 2016) (reporting that "every day people watch hundreds of millions of hours on YouTube" and that YouTube "reaches more 18–34 and 18–49 year-olds than any cable network in the U.S.").

Universal did not actually consider the factors constituting fair use, its representation was false—a misrepresentation. Because those factors are set forth in § 107 (and § 107 expressly states that a fair use "is not an infringement of copyright"), Universal's misrepresentation was knowing. And because there is no further disputed issue of fact concerning liability, I respectfully dissent.